AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
) Case No. 2:20-mj-529
1664 Bryden Road, Columbus, Ohio 43205 )
including all outbuildings and curtilage )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances; Possession with Intent to Distribute and Distribution of Controlled Substances |
| 21 U.S.C. 841 | |

The application is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

JACOB SMITH, Drug Enforcement Administration TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: 7-31-20

*Judge's signature*

City and state: Columbus, Ohio    Chelsey M. Vascura, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

Your Affiant, Jacob Smith, being duly sworn, does hereby depose and state as follows:

I.

## INTRODUCTION

1. I am currently employed as a Deputy for the Franklin County Sheriff's Office, currently assigned full-time as a Task Force Officer with the Drug Enforcement Administration (DEA) Columbus District Office. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code (U.S.C.) § 2510(7), that is, an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in Title 18, U.S.C. § 2516. Your Affiant is empowered to investigate, to make arrests with or without warrants and to execute search warrants under the authority of Title 21, U.S.C. § 878 and the Ohio Revised Code. Since 2013, your Affiant has been employed with the Franklin County Sheriff's Office. Prior to that employment, your Affiant was employed with multiple law enforcement agencies within the State of Ohio for approximately three years. Those law enforcement agencies include the Village of Obetz Police Department as a full-time Officer, Sharon Township Police Department as a part-time Officer and the Westerville Police Department as a reserve Officer.

2. Prior to being assigned to the DEA Task Force in February 2019, your Affiant was a Detective with the Franklin County Sheriff's Office (FCSO), Special Investigations Unit and had been assigned to that unit since July 2014. Your Affiant, while assigned to the Special Investigations Unit, has conducted or participated in numerous state and federal narcotics investigations concerning the possession and distribution of controlled substances. Your Affiant was also assigned to the FCSO Heroin Overdose Prevention and Education (H.O.P.E) Task Force where I conducted numerous criminal investigations pertaining to fatal and non-fatal overdoses, these investigations resulted in convictions in Franklin County Common Pleas Court and United States District Court, Southern District of Ohio.

3. As a DEA Task Force Officer, I have participated in numerous investigations which have resulted in the successful prosecution of individuals and organizations involved in trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine and other controlled substances. Through the course of these investigations, I have personally interviewed confidential sources and other persons involved in the distribution of illegal narcotics. I have also interviewed persons arrested for the distribution of illegal narcotics. I have spoken with more experienced narcotics investigators with whom I have worked concerning the practices of narcotics traffickers and the best investigative methods to use when conducting investigations of narcotics trafficking organizations. Through the

1

course of my investigations and through my conversations with more experienced narcotics investigators, I have become familiar with the methods and means utilized by persons who participate in the illegal distribution of controlled substances.

## II.

## PURPOSE OF AFFIDAVIT

4. This Affidavit is made in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the following premises:

   a. the residential property located at **1664 Bryden Road, Columbus, Ohio 43205 including all outbuildings and curtilage** (hereinafter referred to as the **TARGET LOCATION**). This premises is more fully described in Attachment A incorporated herein by reference.

5. Based upon the information below, I have probable cause to believe that inside the **TARGET LOCATION** described in the previous paragraph, there is property that constitutes evidence of the commission of a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and property designed or intended for use or which is or has been used as a means of committing a criminal offense. Specifically, I have probable cause to believe that within the above mentioned property there is evidence of violations of Title 21, U.S.C. § 846, Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances and Title 21, U.S.C. § 841(a)(1), Possession with Intent to Distribute and Distribution of Controlled Substances. Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment B (incorporated herein by reference) will be found at the **TARGET LOCATION** described in Attachment A.

6. The information contained in this Affidavit is largely based upon investigations conducted by your Affiant and other law enforcement officers. All of the details of the investigation are not included in this Affidavit, only information necessary to establish probable cause that evidence associated with drug trafficking offenses is located at/in the **TARGET LOCATION**. Unless specifically quoted, the conversations described below are set forth in substance and not verbatim.

## III.

## FACTS SUPPORTING PROBABLE CAUSE

7. In July 2020, your Affiant and another investigator with the Drug Enforcement Administration (DEA) Columbus District Office (CDO) met with an Upper Arlington Police Department Confidential Source hereinafter referred to as CS. The CS is cooperating and providing information for consideration on a pending criminal matter. While meeting with the CS, your Affiant obtained information pertaining to an individual known to the CS as "Kay Kay". According to the CS, "KayKay" is involved in trafficking drugs including Alprazolam (Xanax), Lysergic Acid Diethylamide (LSD), Marijuana and MDMA (Molly). CS is aware of this information based upon the CS making purchases of drugs from "KayKay" in the past sixty days. Following the meeting, law enforcement reviewed the Snapchat account (a social media messaging application) associated with the CS and which was provided to law enforcement by the CS. While reviewing this account, investigators discovered the name Michaela SAMUEL within the Snapchat account associated with "Kay Kay." Once this was discovered, law enforcement searched the name Michaela SAMUEL using a law enforcement database and located an individual identified as Michaela SAMUEL. Law enforcement contemporaneously viewed the photograph of "Kay Kay" provided by the CS from the CS's Snapchat activity and the photograph provided by the Ohio Bureau of Motor Vehicles (BMV) of SAMUEL. Upon review, law enforcement was able to positively identify "Kay Kay" as SAMUEL.

9. In July 2020, your Affiant directed CS to make contact with SAMUEL and arrange a narcotics transaction with the Affiant (acting in an undercover capacity) for a total of one-hundred (100) tablets portrayed as 2 milligram Alprazolam (Xanax). On Snapchat, SAMUEL posts and advertises photographs of drugs for purchase that based upon their markings and appearance are portrayed or purported to be certain drugs. The CS communicated with SAMUEL via Snapchat and made arrangements for the purchase of Alprazolam arranged to take place on July 21, 2020. Alprazolam is a Schedule IV controlled substance.

10. On July 21, 2020, your Affiant, while working in Columbus, Ohio in an undercover capacity for the DEA CDO, conducted a total of two narcotics transactions with SAMUEL who was the front seat passenger in a KIA Forte operated by the registered owner Sage FIGUEROA. During the initial narcotics transaction, your Affiant purchased a total of one-hundred tablets scored and purported to be 2 milligram Alprazolam (Xanax) tablets for the sum of five-hundred dollars ($500.00) in pre-recorded United States (US) currency. Following the initial transaction, your Affiant asked SAMUEL if he could obtain an additional fifty (50) Alprazolam tablets. Upon making this request, SAMUEL along with the FIGUEROA, agreed to the additional transaction and instructed your Affiant to stay at the meet location.

3

11. Upon SAMUEL and FIGUEROA leaving the area, law enforcement followed them back to the **TARGET LOCATION**. Upon arriving at the **TARGET LOCATION**, law enforcement observed FIGUEROA exit the KIA Forte and enter the front door of the **TARGET LOCATION**. Shortly after this was observed, law enforcement observed FIGUEROA exit the front door and return to the KIA Forte. Upon entering the KIA Forte, law enforcement observed the vehicle leave the area.

12. Once SAMUEL and FIGUEROA left the area of the **TARGET LOCATION**, law enforcement followed them to the meeting location where your Affiant and a CS were located. Upon their arrival, your Affiant exited his undercover vehicle and walked toward the KIA Forte where SAMUEL and FIGUEROA were located. While walking up to the vehicle, your Affiant observed FIGUEROA hand SAMUEL a clear plastic bag containing what was later determined to be fifty (50) tablets scored and purported to be two milligram Alprazolam (Xanax). Upon making this observation, SAMUEL provided your Affiant with the clear plastic bag of the fifty (50) tablets in exchange for two-hundred and fifty dollars ($250.00) in pre-recorded United States currency.

13. Following the narcotics transaction, members of the DEA CDO eventually followed SAMUEL and FIGUEROA back to the rear of the **TARGET LOCATION**. Upon arriving in the alley area of the **TARGET LOCATION**, members of DEA CDO observed SAMUEL enter into her red Chevrolet Cruze bearing Ohio registration (HXY-8914). In the course of this investigation, your Affiant confirmed SAMUEL is the registered owner of this Chevrolet Cruze. Your Affiant has also learned through the CS that the CS has observed SAMUEL operating a red Chevrolet sedan which matches the physical description of the Chevrolet Cruze. While at the rear of the residence, DEA Task Force Officer (TFO) Baer, conducted on-foot surveillance in the rear alley of the **TARGET LOCATION**. While this took place, SAMUEL made contact with DEA TFO Baer who was acting in a plain clothes capacity. During a brief conversational exchange, SAMUEL spoke with TFO Baer regarding her vehicle possibly being broken into. It was during that brief conversation, TFO Bear inquired as to where SAMUEL lived. SAMUEL informed TFO Baer that she lived at "1664." The conversation between TFO Baer and SAMUEL concluded shortly thereafter. Prior to the surveillance being terminated, law enforcement observed SAMUEL enter the front door of the **TARGET LOCATION** while FIGUEROA was in the threshold of the doorway.

14. During this investigation, your Affiant has been in contact with SAMUEL using a social media application as well as telephone number 614-625-6403. Following the narcotics transaction on July 21, 2020, your Affiant requested the telephone number of SAMUEL in order to arrange future narcotics transactions. The number was provided to the CS and the CS provided telephone number 614-625-6403 to your Affiant. Upon receiving the telephone number, your Affiant conducted a search on telephone number 614-625-6403 using a commercially

4

available database. Upon conducting the search, your Affiant discovered SAMUEL is the top result for individuals associated with telephone number 614-625-6403. Your Affiant also discovered SAMUEL's current address, according to the commercially available database, is the **TARGET LOCATION.**

15. On July 16, 2020 at approximately 11:01 a.m., the honorable Franklin County Municipal Court Judge Thomas granted a search warrant for the application of a Global Positioning System (GPS) device for SAMUEL's 2016 red Chevrolet Cruze bearing Ohio registration (HXY-8914). Upon the search warrant being granted, members of DEA CDO executed the search warrant and began monitoring the vehicle's location. Since the execution of the search warrant, the Chevrolet Cruze has stayed overnight almost daily in the area of the **TARGET LOCATION.**

16. On or about July 22, 2020, your Affiant, while working in an undercover capacity, engaged in a conversation with SAMUEL using the chat function of a social media application. The following depicts, in substance, the conversation with SAMUEL and is not verbatim. During conversation, SAMUEL informed your Affiant that she was "grabbing more Mollz" and she had "lsd vials and dmt carts." Your Affiant believed due to training and experience, SAMUEL was informing him she had "Molly" which is a street or slang term used for MDMA, a Schedule I controlled substance. In addition to the MDMA, your Affiant was informed by SAMUEL the LSD vials contained 300 "hits" for the price point of four-hundred dollars apiece. LSD is a Schedule I controlled substance. Your Affiant knows, through training and experience, the term "hit" is a slang term for dose. Your Affiant later inquired about the vials of LSD. Upon making this inquiry, SAMUEL informed your Affiant, using a voice message function, that "I have as many as you (your Affiant) need." SAMUEL continued stating "now I have two or three at my house um..at the trap." Your Affiant knows, through training and experience, the term "trap" is a slang term used for a narcotics trafficking establishment. Your Affiant believes SAMUEL initially informed him the LSD vials were at her residence but quickly retracted that statement to her "trap" in order to separate the association with her residence and controlled substances. SAMUEL informed your Affiant that she could obtain as many as your Affiant needed due to SAMUEL's source of supply manufacturing them. SAMUEL explained this unidentified manufacturer and source of supply for liquid LSD is a "Chemist" and professor at Columbus State (Community College).

17. On or about July 25, 2020, your Affiant, while working in an undercover capacity engaged in a second conversation with SAMUEL using telephone number 614-625-6403. The following depicts, in substance, the conversation with SAMUEL and is not verbatim. During the conversation, your Affiant inquired about obtaining vials of LSD from SAMUEL. During the conversation, your Affiant requested a total of twenty vials of LSD for the price point of two-hundred and seventy-five dollars ($275.00) each. While speaking with SAMUEL, your

5

      Affiant was informed by SAMUEL that she would contact an individual (believed to be her source of supply) for a total of fifteen (15) vials of liquid LSD. This concluded the conversation with SAMUEL on July 25, 2020. As recently as July 27, 2020, your Affaint received information from SAMUEL that her source of supply for liquid LSD is currently in out of town in California. Upon your Affiant being provided this information, SAMUEL confirmed she would be able to complete a transaction for fifteen vials of LSD with your Affiant once her source of supply is back (in Ohio) from California.

18. On July 28, 2020 law enforcement received results from an Administrative Subpoena which was sent to American Electric Power (AEP) for account holder information for the residence of 1664 Bryden Road in Columbus, Ohio. Upon reviewing the documents provided by AEP, investigators discovered SAMUEL is the account holder for 1664 Bryden Road in Columbus, Ohio. In addition to this discovery, investigators discovered SAMUEL also uses telephone number 614-625-6403 as one of the telephone numbers for the AEP utilities account.

## IV.

## COMMON CHARACTERISTICS OF DRUG TRAFFICKERS

19. Based on my training, education, and experience, as well as training, education and experience of other law enforcement officers, I know:

    a. That drug traffickers often amass significant assets from their illegal drug trafficking activities.

    b. That drugs traffickers often maintain large amounts of U.S. currency derived from illegal activities. It is common for individuals to secrete contraband and conceal proceeds of drug sales and records of drug transactions in secure locations such as personal residences or businesses where they have ready access and control. Often, these locations are used to conceal the existence of substantial wealth from law enforcement authorities.

    c. That drug traffickers also attempt to legitimize their profits by converting it into other assets, such as stocks, bonds, precious metals, jewelry, real estate, vehicles and other assets. To accomplish these goals, these individuals utilize false and fictitious business records, nominee purchasers, foreign and domestic banks, securities, cashiers checks, money drafts, letters of credit, brokerage houses, real estate shell corporations and business fronts. These individuals conceal, in their residences, businesses, safes, safe deposit boxes, storage units and vehicles, currency, cashier's checks, money orders and other negotiable instruments, as well as the records relating to the acquisition, conversion, movement, transfer, and disbursement of these funds and assets. Additionally, the drug traffickers

6

themselves usually control access to these areas. Further, it is not uncommon for narcotics traffickers to "legitimize" their funds through casinos, documenting their "winnings" in an attempt to show an additional source of income.

d. That drug smugglers are not unlike other members of society in that they rely on credit and debit cards to make financial payments. Records relating to the use of these cards can provide valuable information to the investigation by establishing, among other things, the amount of money that is being spent by the suspects, their travel patterns (e.g., using a credit card to pay for gasoline on a cross-country trip), and may further identify businesses which are associated with the illegal activities of the suspects.

e. That drug traffickers deal in currency and store currency in conveyances, homes and at business sites. Furthermore, the Currency Transaction Report (CTR) (IRS Form 4789) is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction that exceeds $10,000. This requirement causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at financial institutions because these reports can be made available to law enforcement officials. It is quite common for individuals who deal in illegal controlled substances to convert drug proceeds (currency) into cashiers checks and or money orders in amounts less than $10,000 at numerous financial institutions over the course of several days in order to avoid the CTR filing requirement. Furthermore, drug traffickers often recruit other individuals to convert drug proceed currency for them in order to avoid handling the currency themselves.

f. That drug traffickers use financial habits designed to minimize and hide a paper trail. Traffickers often purchase and/or title their assets in fictitious names, aliases, or in the names of relatives, friends, associates or business entities to avoid detection of these assets by government agencies, especially the Internal Revenue Service. Regardless of documented ownership, the drug traffickers continue to use these assets and exercise control over them.

g. That drug traffickers maintain books, records, receipts, notes, ledgers, bank records, accounting records and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of controlled substances. These ledgers often contain amounts of drugs; accounting of payments made and received, accounts receivable and accounts payable used in furtherance of their drug trafficking activities. These individuals commonly "front" (provide illegal controlled substances on consignment) illegal controlled substances to their clients and thus keep some type of record concerning moneys owed. Drug traffickers often maintain phone books, address books and other papers containing names,

    telephone numbers, and addresses of suppliers and purchasers of controlled substances. The names and numbers are often written in a code that requires drug traffickers to keep a key to their particular code.

h.     The aforementioned books, records, receipts, notes, ledgers, codes, etc., are usually maintained in a secure location where dealers in illegal controlled substances have ready access to them such as on their person, vehicle, business, safe deposit box, home safe, personal or business computer, storage facility or in other residences or businesses where they periodically reside or have access and control.

i.     It is not uncommon for individuals who deal in illegal controlled substances to take, or cause to be taken, photographs of themselves, their associates, their property and their illegal product. These individuals usually maintain these photographs in their possession or in residences where they reside or have access and control.

j.     That drug traffickers commonly use cellular telephones to coordinate various narcotics trafficking activities. Other traffickers, in order to avoid speaking on telephones, use numeric codes on electronic devices to communicate with co-conspirators.

k.     That drug traffickers often engage in domestic and/or international travel in relation to the smuggling of illegal contraband. Analysis of travel records and documents can assist in the development of the investigation by revealing potential source and/or destination locations related to the distribution of illegal narcotics or the payment of related proceeds.

l.     Persons who traffic in controlled substances are not unlike any other individual in our society in that they maintain documents and records. These documents and records will normally be retained for long periods regardless of whether their value to the individual has diminished. Often times, this type of evidence is generated, maintained and subsequently forgotten about. Hence, documents that one would normally think a prudent person would destroy because of their incriminating nature are still possessed months or even years after they come into the possession of a drug trafficker. Often times these individuals do not even realize the incriminating nature of the documents they keep.

//

//

//

V.

## CONCLUSION

20. Based on the facts set forth in the Affidavit, your Affiant believes there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime and associated with the above listed drug trafficking offenses is located inside the **TARGET LOCATION including all outbuildings and curtilage.** WHEREFORE, based on the foregoing evidence of drug trafficking, I respectfully request that the Court issue a search warrant and sealing order for the location described in Attachment A and the property described in Attachment B. Investigators request that this warrant be SEALED.

Jacob Smith
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me
this 31 of July, 2020

CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

## DESCRIPTION OF PROPERTY TO BE SEARCHED

**The Target Location: 1664 Bryden Road Columbus, Ohio 43205 including all outbuildings and curtilage** is described as a two-story duplex with brick siding along with red and white trim. The numbers "1664" are affixed horizontally in white colored numbering against a dark colored placard to the left of the red front exterior door which faces in a southern direction.

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

The evidence to be searched for and seized is:

- A. Alprazolam, LSD and any other controlled substances;

- B. Documents and other items tending to show dominion and control over the premises/vehicle, including, but not limited to, bills or other business-related documents, correspondence, photographs;

- C. Documents or other items tending to identify co-conspirators and sources, including, but not limited to, letters, notes, memoranda, photographs, address and phone books, maps, organizers, or lists of names;

- D. Items commonly used to facilitate drug trafficking, including but not limited to items such as firearms, ammunition, cellular telephones, pay/owe sheets, packaging materials, "cut", scales, and grinders;

- E. Likely proceeds of drug trafficking, such as United States currency and other negotiable instruments; and

- F. Documents and other items tending to establish or hide the whereabouts of proceeds from drug trafficking, such as safes, keys to other locations, and financial records.